# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY SCOTT BRONSON, | Case No. 1:23-cv-01219-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| MARTIN O'MALLEY, Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |

## I.  INTRODUCTION

Plaintiff Jeffrey Scott Bronson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI) under the Social Security Act (the "Act"). (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On December 20, 2023, Martin O'Malley was named Commissioner of the Social Security Administration. *See* https://www.ssa.gov/history/commissioners.html.  He is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant.").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 10.)

## II.     FACTUAL BACKGROUND

On December 9, 2020, Plaintiff protectively filed claims for DIB and SSI payments, alleging he became disabled on May 1, 2018, due to neuropathy in legs and into feet; knee pain; back pain; neck pain; severe depression; severe anxiety; bipolar disorder; diverticulosis; and diverticulitis. (Administrative Record ("AR") 17, 127, 149, 171, 194, 468.)

Plaintiff was born on September 4, 1984, and was 33 years old on the alleged disability onset date. (AR 30, 76, 89, 102, 114, 126, 148, 170, 193.) He has an 11th grade education and can communicate in English. (AR 30, 52, 132, 154, 467, 469.) Plaintiff has previously worked as a cashier and a computer repair technician. (AR 30, 52, 385.)

### A.     Relevant Evidence of Record[3]

#### 1.     Medical Evidence

In March 2018, Plaintiff presented to a hospital clinic complaining of increased left knee pain caused by a fall. (AR 733–34, 994–96.) Medial to posterior knee swelling was noted, with normal reflexes and normal coordination. (AR 734, 995.) Plaintiff presented to an orthopedic clinic to treat his sharp knee pain in May 2018. (AR 586.) An MRI of the left knee demonstrated a medial meniscus tear. (AR 586, 622, 1209.) He was using a cane to ambulate, and complained of numbness. (AR 586.) On examination, Plaintiff's bilateral knees had intact neurologic and vascular status distally; normal alignment; no effusion; normal range of motion; stability to varus, valgus, anterior, and posterior stress; no tenderness over the medial or lateral joint line; and no patellar instability, apprehension, or crepitus. (AR 588.) The provider noted that Plaintiff's numbness is "likely due to back issues," and recommended a left knee cortisone injection, physical therapy, and a lower back MRI. (AR 588.)

Plaintiff presented to the emergency department in June 2018 complaining of constipation, abdominal pain, and head pain. (AR 729–31, 988–90.) On examination, Plaintiff had normal neck and musculoskeletal range of motion with no tenderness. (AR 730, 989.) He displayed normal coordination, normal reflexes and normal muscle tone, with no sensory deficits. (AR 730, 989.)

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

Plaintiff had a normal mood and affect. (AR 730, 989.) A lumbar spine MRI performed in July 2018 showed a mild disc bulge at L5-S1 without effecting the nerve roots, and a minimal disc bulge osteophyte complex at L4-5 without mass effect on the nerve roots. (AR 1208.)

In August 2018, Plaintiff presented for a follow up appointment for continuing left knee pain radiating down his leg and back pain. (AR 579.) He was using an assistive cane. (AR 579.) An MRI of Plaintiff's lumbar spine taken in July 2018 showed "L5-S1 mild disc bulge without affecting the nerve roots and L4-5 minimal disc bulge osteophyte complex eccentric to the right without mass effect on the roots." (AR 579, 621.) On examination, Plaintiff's bilateral knees had intact neurologic and vascular status distally; normal alignment; no effusion; normal range of motion; stability to varus, valgus, anterior, and posterior stress; no tenderness over the medial or lateral joint line; and no patellar instability, apprehension, or crepitus. (AR 581.) He demonstrated appropriate mood and affect. (AR 581.) Plaintiff reported that he had received a steroid injection the month before but reported it did not provide any relief. (AR 579.) A "variety of conservative treatment options" were discussed and Plaintiff was referred to a rehabilitation specialist. (AR 582.)

Plaintiff presented to a rehabilitation facility for treatment of left knee and low back pain in September 2018. (AR 628.) On examination, Plaintiff could walk on his heels and toes with some difficulty, and was able to go into a "shallow squat." (AR 629.) He had good range of motion in his cervical spine. (AR 629.) His strength was normal in his bilateral lower extremities, with normal muscle tone and no sensory loss. (AR 630.) Plaintiff had a positive left straight leg raising test, with patellofemoral irritability and a positive patellar grind test. (AR 630.) Plaintiff's left knee had some "popping" but no anterior effusion or trace effusion in the popliteal fossa, and was stable to varus and valgus stress. (AR 630.) He was pleasant and cooperative, with no indication of a "formal thought disorder." (AR 630.) That same month, Plaintiff reported experiencing continued anxiety and panic attacks. (AR 656, 657, 898.) On examination, he displayed appropriate mood and affect and normal insight, judgment, and memory. (AR 658, 899.)

Plaintiff presented for a follow-up appointment to treat his depression in January 2019 and noted both "continuation" and "improvement" in his initial symptoms. (AR 634–35.) He complained of anxiety, difficulty concentrating, excessive worry, feelings of depression and

hopelessness, feelings of guilt, and suicidal ideation.  (AR 634, 637.)  His mental status examination showed appropriate mood and affect, normal insight, and normal judgment.  (AR 638.)  Plaintiff stated that he was "not interested in medication right now."  (AR 635.)  That same month, Plaintiff presented for a gastroenterologist appointment to treat abdominal pain.  (AR 716.)  On physical examination, Plaintiff's had a normal gait, tone, and strength.  (AR 720.)  He also demonstrated no depressed mood, anxiety, or agitation.  (AR 720.)

In February 2019, Plaintiff presented for a follow up appointment following hospitalization for abdominal pain, dizziness, and loss of consciousness.  (AR 827, 871.)  He complained of headaches, back pain, and numbness.  (AR 827, 871.)  He also noted he was feeling "overwhelmed and anxious about all that is going on."  (AR 827–28, 871–72.)  On examination, Plaintiff demonstrated appropriate mood and affect, with normal insight and judgment.  (AR 829, 873.)

In May 2019, Plaintiff attended a preventative care examination.  (AR 847.)  He displayed diminished strength in his left lower extremity, and normal grip strength.  (AR 850.)  Plaintiff presented for treatment of musculoskeletal pain in June 2019.  (AR 843.)  He reported aching pain in his left hip and flank, which radiates.  (AR 843.)  He ambulated with a cane and demonstrated tenderness and mild pain with motion in his lumbar spine.  (AR 845.)

In July 2019, Plaintiff complained of worsening neck pain.  (AR 834.)  He reported decreased mobility, muscle spasm, numbness, tingling, and weakness in his extremities.  (AR 834.)  Plaintiff's physical examination showed tenderness and moderately reduced range of motion in Plaintiff's cervical spine.  (AR 836.)  Pain was indicated with cervical flexion and extension.  (AR 836.)  Plaintiff's grip strength was reduced, but intact sensation.  (AR 836.)  His memory was normal, with appropriate mood and affect and normal insight and judgment.  (AR 836.)  He was instructed to do neck exercises.  (AR 836.)

An MRI of Plaintiff's cervical spine performed August 2019 showed multiple small cervical disc protrusions causing mild canal stenoses.  (AR 936.)  That same month, Plaintiff complained of headaches and abdominal discomfort.  (AR 861.)  His mental status examination showed a flat affect with normal insight and judgment and no suicidal ideation.  (AR 863.)

In October 2019, Plaintiff complained of upper extremity weakness and radiculopathy,

chronic low back pain, and cervical spine pain. (AR 1196.) On examination, Plaintiff had limited range of motion in his neck, with pain to palpation. (AR 1198.) A November 2019 upper extremity electrodiagnostic study was normal. (AR 1337–38.)

In May 2020, Plaintiff complained of large joint pain, as well as pain in the neck, base of the head, shoulders, elbows, low back and mid back. (AR 1170.) On examination, Plaintiff had muscle tenderness in his neck with flexion, in his left lower back on palpation, and in his left shoulder with severe crepitus. (AR 1173.) He also had full range of motion in his right shoulder, reduced range of motion and pain in his left knee, and normal range of motion in his elbows. (AR 1173.)

In June 2020, Plaintiff presented to the emergency department with a sudden onset of weakness, numbness, and tingling in the face and limbs, with associated back pain, extremity pain, intermittent shaking, dizziness, and visual changes. (AR 974.) He reported a history of panic attacks and indicated he self-medicates his anxiety with marijuana. (AR 974.) On physical examination, Plaintiff had an anxious and depressed affect, and full passive musculoskeletal range of motion without pain or neck rigidity. (AR 975.) The provider noted Plaintiff appeared "withdrawn, slowed, anxious, and derepressed," with "[s]low hyperventilation." (AR 976.) Plaintiff reported worsening depression at a follow up appointment. (AR 1155.) His mood was noted to be depressed and sad. (AR 1156.)

That same month, Plaintiff complained of headaches and numbness and tingling in his legs. (AR 978.) He denied depression, anxiety, and hallucinations. (AR 980.) His mental status examination showed he was alert and oriented, slow to respond with intact speech and language, and answered questions and followed commands "appropriately." (AR 980.) Left lower extremity electrodiagnostic studies were normal. (AR 1186, 1334.) Plaintiff also sustained a fall that month, resulting in a lower back sprain. (AR 1150.) He had musculoskeletal pain with range of motion and while lifting his knee, an antalgic gait, and normal balance. (AR 1152.) He was advised to continue using his cane and to perform home exercises. (AR 1150.)

Plaintiff presented to urgent care to start mental health treatment in September 2020 following an involuntary inpatient psychiatric hospitalization earlier that month after he and his fiancée broke up. (AR 1089–95, 1232–35.) He was currently medicated and being treated for major

5

depressive disorder with psychosis. (AR 1092, 1232.) Plaintiff reported symptoms of auditory hallucinations, paranoia, delusions, racing thoughts, difficulty concentrating, easily irritated, anxiety, depression, sadness, feelings of wanting to cry, hopelessness/helplessness, worthless, low motivation, impairment in activities of daily living, and sleeping problems. (AR 1092, 1232, 1235.) He also indicated he experienced symptoms of hallucinations, paranoia and delusions 1–3 times per week. (AR 1092, 1232, 1235.) On mental status examination, Plaintiff was calm and cooperative, with depressed mood. (AR 1091, 1234.) His thought flow was focused and coherent, with fair memory, abstraction, and interpretation. (AR 1091, 1234.) He was treated with medications for psychosis and anxiety. (AR 1092, 1093, 1095, 1237.)

In December 2020, Plaintiff participated in an individual therapy session for his major depressive disorder with psychotic symptoms. (AR 1117.) He reported having anxiety daily and depression daily, and that he was "not taking his new medications that he has been prescribed." (AR 1117.)

Plaintiff reported for a follow up appointment for bipolar disorder in January 2021. (AR 1099–1100.) He reported that his mood was "still unstable" but that he had not been taking his medication. (AR 1099.) His mental status examination showed he was cooperative with alert sensorium and normal cognition, speech, orientation, and affective range. (AR 1099.) He exhibited a depressed mood and limited insight and judgment, and was assessed with bipolar disorder. (AR 1099–1100.) Plaintiff was advised to take his medication as prescribed. (AR 1100.)

Plaintiff reported to Angela Desai, NP, in February 2021 that he still felt "a little depressed or anxious," but that he didn't "have any mood swings or the hallucinations anymore." (AR 1097.) On examination, he was cooperative and alert, with normal cognition, speech, and orientation. (AR 1097.) He denied any paranoia or suicidal ideation, and was noted to have fair insight and limited judgment. (AR 1097.) His medications were increased to treat his depression, anxiety, and mood. (AR 1098.) That same month, an MRI of Plaintiff's lumbar spine showed mild lumbar spondylosis and no central or neural foraminal stenosis. (AR 1221.)

In April 2021, Plaintiff presented for an internal medicine evaluation by consultative examiner Steven Stolz, M.D., FACP. (AR 1225–30.) Dr. Stolz noted Plaintiff's use of a cane to

ambulate.  (AR 1227.)  On examination, Plaintiff demonstrated some back pain with left knee extension, and had a positive straight leg raising test bilaterally.  (AR 1228.)  Hs motor strength, sensation, and reflexes were normal.  (AR 1229.)  Plaintiff continued to report anxiety that month.  (AR 1237, 1238.)  He presented as cooperative with a depressed, anxious, and irritable mood, with normal cognition, speech, orientation, insight, and judgment.  (AR 1238.)  He was prescribed another medication for anxiety and pain.  (AR 1239.)

In June 2021, Plaintiff reported at an individual therapy session he was "doing okay," with symptoms of depression and anxiety.  (AR 1237, 1246.)  No psychosis was noted.  (AR 1246.)  Several "no-show" appointments were noted in 2021 and 2022.  (AR 1304, 1305.)

Dr. Stolz conducted another internal medicine evaluation in September 2021.  (AR 1263–68.)  On examination, Plaintiff had no tenderness in his back and his straight leg raising test was negative.  (AR 1266.)  He had "a somewhat slow gait" with no focal or asymmetric findings.  (AR 1267.)  An MRI of Plaintiff's lumbar spine performed November 2021 showed mild cervical spondylosis without neural compressive changes.  (AR 1284.)

In January 2022, Plaintiff presented to N.P. Desai for a follow up appointment.  (AR 1309.)  He reported some confusion and memory loss, with symptoms of depression and irritability.  (AR 1310.)  His mental status examination showed cooperative behavior and normal orientation and organized thought processes, with irritable and anxious mood, impaired memory, fair insight, and limited judgment.  (AR 1309.)

Plaintiff presented for a psychiatric evaluation with N.P. Desai in August 2022.  (AR 1325–28.)  N.P. Desai noted that Plaintiff continues to have recurrent depression, anxiety and insomnia with occasional hallucinations.  (AR 1327.)  On examination, Plaintiff was cooperative, with normal motor activity, alert sensorium, normal cognition and speech, and organized thought process.  (AR 1326.)  He did not wish to increase his medications, as they made him feel tired.  (AR 1327.)

In November 2022, Plaintiff reported to Hope Lo, N.P., feelings of depression, anxiety, and irritability.  (AR 1291, 1292.)  He had experiencing paranoia and visual hallucinations, and had not been taking his medications consistently.  (AR 1291, 1292.)

7

### 2. Opinion Evidence

Following his examination of Plaintiff, consultative physician Dr. Stolz opined in April 2021 that Plaintiff could stand and walk for four hours in an eight-hour day; that he had no limitations in sitting; that he did not require the use of a cane; that he could occasionally lift and carry 10 pounds; that he could occasionally perform postural activities; that he had no manipulative limitations; that he could occasionally climb stairs and ramps and was limited from climbing ladders or scaffolding; and that he was limited in working at unprotected heights. (AR 1229.)

In May 2021, G. Lee, M.D., a State agency physician, reviewed the record and assessed Plaintiff's physical residual functional capacity (RFC).[4] (AR 138–41, 160–63.) Dr. Lee found that Plaintiff could perform light work; that he could occasionally climb ladders, ropes, scaffolds, ramps, and stairs; that he could frequently balance and occasionally stoop, kneel, crouch, and crawl; and that he had to avoid concentrated exposure to hazards. (AR 138–41, 160–63.) Upon reconsideration in September 2021, another State agency physician, K. Mohan, M.D., reviewed the record and agreed with Dr. Lee's assessment, except they found that Plaintiff did not have any environmental limitations. (AR 183–86, 206–209.)

State agency physician Uwe Jacobs, Ph.D., assessed Plaintiff's mental RFC in May 2021 and opined that Plaintiff had a moderate limitation in interacting with others and mild limitations in the remaining areas of functioning. (AR 141–43, 163–65.) In September 2021, upon reconsideration, another State agency physician, Helen C. Patterson, Ph.D., reviewed the record and agreed with Dr. Jacob's assessment. (AR 186–88, 209–11.)

In September 2021, Dr. Stolz opined, following his second examination, that Plaintiff could stand and walk for four to six hours in an eight-hour workday; that he had no restrictions on sitting; that he did not need to use a cane for most of his physical activities; that he could frequently lift and

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

carry 10 pounds and occasionally lift and carry 20 pounds; that he could occasionally perform postural activities; that he had no manipulative restrictions; and that he could occasionally climb ramps and stairs and that he should never climb ladders or scaffolding. (AR 1267–68.)

In November 2021, Ellen Winger, N.P., completed a "Physical Medical Source Statement," wherein she opined that Plaintiff could walk one block without rest or severe pain; that he could sit for 20 minutes at one time and less than two hours in an workday; that he could stand for 10 minutes at one time stand/walk for less than two hours in a workday; that he needs a job that permits shifting positions at will; that he needs periods of walking around during the workday for five minutes every 20 minutes; that his legs should be elevated with prolonged sitting; that his legs should be elevated for 50% of the time during an eight-hour day if he had a sedentary job; that he requires the use of an assistive device; that he could rarely lift and carry less than 10 pounds; that he could never twist, stoop, bend, crouch, squat, and climb ladders and rarely climb stairs; that he had limitations in twisting objects and fine manipulation bilaterally; that he would be off-task 25% or more of the time; that he is incapable of even low stress work; and that he would be absent more than four days per month. (AR 1271–73.)

N.P. Desai completed a "Mental Residual Functional Capacity Questionnaire" in January 2022, wherein she opined that Plaintiff's mental abilities in understanding and memory were precluded for 5% of an eight-hour day; that his mental abilities for sustained concentration and memory ranged from not precluded to precluded for 15% or more of an eight-hour workday; that his abilities for social interaction ranged from precluded for 5% of an eight-hour workday to precluded for 10% of an eight-hour workday; and that his ability to adapt ranged from precluded for 10% of an eight-hour workday to preluded for 15% or more of an eight-hour workday; that he would be absent from work five or more days per month; that he is able to manage his benefit payments; and that these limitations began in July 2020. (AR 1275–77.)

In December 2022, N.P. Lo completed a "Mental Disorder Questionnaire for Evaluation of Ability to Work," wherein she opined that Plaintiff requires assistance to keep his appointments; that his ability to perform simple work for two hours at a time for eight hours per day is impaired; that his mood and affect impair his ability to work; that his ability to perform full-time work week after

week was impaired; that his ability to perform activities of daily living has become impaired to the point that he needs assistance from others to achieve socially acceptable standards of self-care; that his social functioning has become deficient to the point that it would impair his ability to work with supervisors, coworkers, or the public; and that his medication side effects impair his ability to perform normal work. (AR 1342–43.)

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's applications for benefits initially on May 25, 2021, and again on reconsideration on September 30, 2021. (AR 17, 235–39, 241–50.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 257–301.) At the hearing on January 12, 2023, Plaintiff appeared with counsel by telephone and testified before an ALJ as to his alleged disabling conditions. (AR 50–68.) A Vocational Expert ("VE") also testified at the hearing. (AR 68–73.)

**C.     The ALJ's Decision**

In a decision dated February 28, 2023, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 17–32.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520, 416.920. (AR 20–31.) The ALJ decided that Plaintiff met the insured status requirements of the Act through September 30, 2021, and he had not engaged in substantial gainful activity since May 1, 2018, the alleged onset date (step one). (AR 20.) At step two, the ALJ found Plaintiff's following impairments to be severe: major depressive disorder with psychotic features; bipolar disorder; unspecified personality disorder; degenerative disc disease; and status post medial meniscus tear left knee. (AR 20.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 20–23.)

The ALJ assessed Plaintiff's RFC and applied the assessment at steps four and five. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

to perform sedentary work as defined in 20 CFR [§§] 404.1567(a) and 416.967(a) except the claimant would require an assistive device such as a cane to ambulate. [Plaintiff] can occasionally balance, stoop, kneel, crouch, and crawl. [Plaintiff] can occasionally climb ramps and stairs and never climb ladders, ropes, and scaffolds. [Plaintiff] can never work in hazardous environments, such as at unprotected heights or around moving mechanical parts. [Plaintiff] can understand, remember, and carry out simple instructions in the workplace, can work in a low stress job, defined as making only occasional decisions and tolerating only occasional changes in the work setting. [Plaintiff] can have no more than occasional interaction with supervisors, coworkers, and the general public with respect to performing work related duties.

(AR 22–26.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (AR 24.)

The ALJ determined that Plaintiff could not perform his past relevant work (step four) but given his RFC, he could perform a significant number of jobs in the national economy (step five). (AR 30–31.)  In making this determination, the ALJ posed a series of hypothetical questions to the VE.  (AR 69–72.)  The VE testified that a person with the RFC specified above could perform the jobs of order clerk, sorter, and laminator.  (AR 69–71.)  The ALJ ultimately concluded Plaintiff was not disabled from May 1, 2018, through the date of the decision.  (AR 31–32.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on July 5, 2023.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

### III.   LEGAL STANDARD

**A.   Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they are] not only unable to do [their] previous

11

work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also* 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). *See also Ford v. Saul*, 930 F.3d 1141, 1153–54 (9th Cir. 2020). "Substantial evidence . . . is 'more than a mere scintilla,' " and means only "such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, (1938)). *See also Ford* , 930 F.3d at 1153–54. "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

**IV.      DISCUSSION**

Plaintiff contends that the RFC is not supported by substantial evidence because the ALJ's "consistency evaluation" of the opinions of Drs. Stolz, Lee, Mohan, Jacobs, Patterson, and N.Ps.

13

Winger, Desai, and Lo (collectively, the "medical opinion evidence") is "non-specific and vague." (Doc. 16 at 29–40.)  The Commissioner responds that the ALJ's analysis of the medical opinion evidence was proper and supported by substantial evidence.  (Doc. 20 at 5–16.)  The Court agrees with the Commissioner.

**A.     Legal Standard**

Plaintiff's claims for DIB and SSI are governed by the agency's "new" regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017. 20 C.F.R. §§ 20 C.F.R. § 404.1520c, 416.920c.  The regulations set "supportability" and "consistency" as "the most important factors" when determining the opinions' persuasiveness. 20 C.F.R. §§ 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2).  And although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [they] considered the medical opinions" and "how persuasive [they] find all of the medical opinions." 20 C.F.R. §§ 20 C.F.R. § 404.1520c(a)–(b); 416.920c(a)–(b).

Recently, the Ninth Circuit issued the following guidance regarding treatment of physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources.").  Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, *see Murray*, 722 F.2d at 501–02, is likewise incompatible with the revised regulations.  Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).  Accordingly, under the new regulations, "the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.* at 787.

In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, and 'explain how [it]

14

considered the supportability and consistency factors' in reaching these findings." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(b)). *See also id*. § 416.920c(b). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Id*. at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)). *See also id*. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id*. at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)). *See also id*. § 416.920c(c)(2).

As the Ninth Circuit also observed,

> The revised regulations recognize that a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion. *See id.* § 404.1520c(c)(3). Thus, an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. *Id*. § 404.1520c(c)(3)(i)–(v). However, the ALJ no longer needs to make specific findings regarding these relationship factors:

*Woods*, 32 F.4th at 792. "A discussion of relationship factors may be appropriate when 'two or more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent with the record . . . but are not exactly the same.'" *Id*. (quoting § 404.1520c(b)(3)). *See also id*. § 416.920c(b)(3). "In that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'" *Id*. Finally, if the medical opinion includes evidence on an issue reserved to the Commissioner, the ALJ need not provide an analysis of the evidence in his decision, even in the discussions required by 20 C.F.R. §§ 404.1520c, 416.920c. *See* 20 C.F.R. §§ 404.1520b(c)(3), 415.920b(c)(3).

With these legal standards in mind, the Court reviews the consideration of the medical opinion evidence.

**B.    Analysis**

Plaintiff does not challenge the ALJ's supportability findings. (*See* Doc. 16 at 34 ("[T]he ALJ's supportability evaluation is specific."); *see also id*. at 39, 40.) Instead, he criticizes the ALJ's consistency analysis of the medical opinion evidence, contending that it lacks specificity and "repeats the same language and citations" from the record. (Doc. 16 at 29–41.) Plaintiff questions

15

how the ALJ could find "identical references" to the medical record could be "simultaneously" consistent with certain limitations opined by the providers and inconsistent with other limitations, and asserts that, in the absence of any explanation from the ALJ, this apparent discrepancy prevents "meaningful review" of the ALJ's RFC determination. (*Id.*)

Had the ALJ merely stated that the medical opinion evidence was inconsistent with the record and cited the same evidence in support of their conclusions, Plaintiff's argument might have merit. For example, in *Fausto S. H. v. Kijakazi*, No. 2:20-CV-7289-MAR, 2022 WL 644167, at *4 (C.D. Cal. Jan. 24, 2022), a case that Plaintiff characterizes as "on point" (Doc. 16 at 35–36), the Court found the ALJ's one-sentence finding, without any citation to the record, that the opined limitations were "not consistent with the record as a whole" was "insufficient for the Court to conduct its review." In contrast to *Fausto S. H.*, here the ALJ went further, describing the contents of the records cited and, more critically, illustrating that they evidence a longitudinal record that "simultaneously" can, and does, establish both normal and abnormal physical (AR 26, 28–29) and psychological (AR 27, 29) findings. (*See* AR 26, 28–29 (citing records showing "degenerative changes in his lumbar and cervical spine and a medial meniscus tear in his left knee" (AR 579, 586, 621, 622, 936, 1208, 1209, 1221, 1284), "use of a cane to ambulate" (AR 579, 586, 845, 1150, 1227), "an antalgic gait" (AR 1152), "left knee tenderness" (AR 579, 1173, 1228), "reduced lumbar range of motion" (AR 1152), "positive straight leg raise" (AR 630, 1228), "patellofemoral irritability" (AR 630), "reduced cervical range of motion" (AR 836, 1198), "cervical tenderness" (AR 836, 1173), "lumbar tenderness" (AR 845, 1173), "pain with lumbar range of motion" (AR 845, 1152, 1173, 1228), and "reduced strength in his left lower extremity" (AR 850), <u>as well as</u> "normal electrodiagnostic studies" (AR 1178, 1337–38), "normal gait" (AR 720), "normal balance" (AR 1152), "normal alignment in his bilateral knees" (AR 581, 588), "no knee tenderness" (AR 581, 588), "normal strength" (AR 630, 720, 836, 850, 1229), "intact reflexes" (AR 730, 734, 989, 995, 1229), "intact sensation" (AR 836, 1229), "normal coordination" (AR 730, 734, 989, 995), "no musculoskeletal tenderness" (AR 581, 588, 730, 989, 1266), "normal musculoskeletal range of motion" (AR 581, 588, 629, 730, 975, 989, 1173), "no back tenderness" (AR 1266), "normal range of motion in his bilateral hips and knees" (AR 581, 588, 975), and "generally conservative treatment" (AR 579, 588,

1150, 1239)); AR 27, 29 (citing records showing "inpatient treatment" (AR 1089–95, 1232–35), "a flat affect" (AR 863), "withdrawn behavior" (AR 976), "anxious mood" (AR 1238, 1309), "depressed mood" (AR 1091, 1099–1100, 1156, 1234, 1238, 1309), "slowed behavior" (AR 976, 980), "paranoid and persecutory thoughts" (AR 1092, 1232, 1235, 1291, 1292), "impaired insight and judgment" (AR 1097, 1099–1100, 1309), "auditory hallucinations" (AR 1092, 1232, 1235, 1291, 1292, 1327), and "impaired memory" (AR 1309), as well as "conservative mental health treatment," (AR 635, 1092, 1093, 1095, 1098, 1117, 1237, 1239, 1246, 1327), "pleasant and calm behavior" (AR 630, 1091, 1234), "cooperative behavior" (AR 630, 1091, 1097, 1099, 1234, 1238, 1309, 1326), "focused behavior" (AR 1091, 1234), "appropriate mood and affect" (AR 581, 638, 658, 730, 829, 836, 873, 899, 989, 1099), "normal insight and judgment" (AR 638, 658, 829, 836, 863, 873, 899, 1238), "intact memory" (AR 658, 899, 836), "normal cognition" (AR 1097, 1099, 1238, 1326), "organized thought process" (AR 1091, 1234, 1309, 1326), and "noncompliance with treatment" (AR 1099, 1117, 1291, 1292, 1304, 1305).)

The ALJ interpreted this (seemingly mixed) evidence, as they are charged to do, and ultimately concluded that the longitudinal medical record is both consistent with greater exertional, postural, and environmental limitations than those opined by Drs. Lee, Mohan, and Stolz, including work at the sedentary level and the use of an assistive device to ambulate (AR 26–28), yet inconsistent with the significant limitations opined by N.P Winger, including, for example, a limitation to sitting for a maximum of 20 minutes at one time and less than two hours in an workday (AR 28–29). With respect to mental impairments, the ALJ concluded that the medical record is both consistent with a greater limitations in Plaintiff's abilities to concentrate, persist, and maintain pace and to adapt and manage oneself than those opined by Drs. Jacobs and Patterson (AR 27), yet inconsistent with a limitation regarding excessive absenteeism, as opined by N.P Desai (AR 29), and with the severe limitations opined by N.P. Lo, such Plaintiff's inability to perform full-time work week after week (AR 29).

The Court finds that these conclusions regarding the consistency of the medical opinion evidence are not discrepant, but instead are supported by the substantial evidence cited. There is

therefore no error in the ALJ's formulation of Plaintiff's RFC.[5]  *See Mills v. Comm'r of Soc. Sec.*, No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 (E.D. Cal. Aug. 22, 2014) ("[I]t is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source.") (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989)); 20 C.F.R. §§ 404.1527(d)(2), 414.927(d)(2) ("the final responsibility for deciding [RFC] is reserved to the Commissioner); *id*. §§ 404.1545(a)(1), 414.945(a)(1)  ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").  *See also Mills*, 2014 WL 4195012, at *4 (finding argument that the ALJ erred in formulating an RFC lacked merit where the ALJ "carefully analyzed the various medical opinions, treatment records, and plaintiff's own testimony in formulating an RFC.").

Plaintiff does not specify what additional functional limitations resulting from his impairments were not accounted for in the ALJ's RFC assessment—indeed, the ALJ accommodated Plaintiff's physical and mental impairments "with a limitation to sedentary work with [] postural, environmental, and mental limitations and an allowance for the use of an assistive device." (AR 30.)  The mere fact that the longitudinal medical record could be interpreted differently is of no consequence, as the Court will not second guess the ALJ's reasonable interpretation, even if the record could give rise to inferences more favorable to Plaintiff.  *See Molina*, 674 F.3d at 1110; *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.") (citations omitted).  *See also Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

Plaintiff may disagree with the RFC, but the Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of the evidence.  *See Ford*, 950 F.3d at 1159

---

[5] In addition to the opinion evidence, the ALJ's RFC assessment is also based on consideration of Plaintiff's subjective complaints.  (*See* AR 23–24.)  Plaintiff does not challenge the sufficiency of the evidence supporting the ALJ's adverse credibility finding or the adequacy of the ALJ's reasons given to explain this finding.  The Court therefore considers the ALJ's unchallenged credibility finding to be binding.  *See, e.g., Stanley v. Astrue*, No. 1:09–cv–1743 SKO, 2010 WL 4942818, at *6 (E.D. Cal. Nov. 30, 2010).

("Our review of an ALJ's fact-finding for substantial evidence is deferential"); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## V.    CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Martin O'Malley, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **April 4, 2024**                    /s/ *Sheila K. Oberto*
                                              UNITED STATES MAGISTRATE JUDGE